

FILED & JUDGMENT ENTERED
Christine F. Winchester

August 8 2025

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
Ashley Austin Edwards
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

In re:

**Sabrina Berry,**

Debtor.

Case No. 25-30309
Chapter 7

## OPINION ON MOTION FOR SANCTIONS
## FOR VIOLATION OF THE AUTOMATIC STAY

**THIS MATTER** is before the Court upon the *Motion for Sanctions for Violation of the Automatic Stay*, which the Debtor filed on June 16, 2025 (the "Motion"). [D.I. 17]. The Court conducted a hearing on the Motion on August 5, 2025 (the "Hearing"). At the Hearing, Jeffrey G. Dalrymple appeared on behalf of the Debtor, and Grace L. Galloway appeared on behalf of herself. Following the Hearing, the Court took this matter under advisement and now renders its opinion.

### BACKGROUND AND PROCEDURAL HISTORY

On March 31, 2025 (the "Petition Date"), the Debtor filed a voluntary bankruptcy petition pursuant to Chapter 7 of the Bankruptcy Code (the "Petition"). [D.I. 1]. On Schedule E/F to the Petition, the Debtor listed "Grace Galloway" ("Dr. Galloway") as a creditor to which the Debtor owes $3,900 in an unsecured claim. *Id.* Dr. Galloway obtained a judgment against the Debtor in September 2023 for an unpaid loan of $3,900 that Dr. Galloway provided to the Debtor in April

1

2023. *Id.* On June 13, 2025, Dr. Galloway filed a proof of claim asserting that the Debtor owed her $6,330.50—$2,430.50 more than originally scheduled.[1] Three days later, on June 16, 2025, the Debtor filed the Motion. [D.I. 17].

Through the Motion, the Debtor seeks entry of an order (1) finding Dr. Galloway in willful violation of the automatic stay and (2) imposing actual and punitive damages, as well as other sanctions, against Dr. Galloway. *Id.* The Debtor alleges that Dr. Galloway violated the automatic stay by employing a "campaign of shaming and humiliating [the] Debtor in the hopes that she will ultimately pay back [Dr. Galloway] just to make [Dr.] Galloway stop the campaign against" the Debtor. *Id.* The Debtor alleges that Dr. Galloway did so by (1) posting two Facebook posts on April 19[2] and 20,[3] 2025, respectively, "that accused Debtor of theft in another attempt to shame Debtor into paying back" the debt owed to Dr. Galloway; and (2) attending a political convention on May 10, 2025, where Dr. Galloway "walked the room advising as many people as she could that Debtor had stolen money from her and stating that she could repay the debt" and causing "numerous people to whom these statements were directed [to] then approach[] the Debtor and sa[y] to her 'why don't you just repay the debt so she'll go away?'" [D.I. 17 ¶¶ 9, 12]. Even though the Debtor apparently could not (and cannot) access Dr. Galloway's Facebook page, Dr. Galloway removed the April 19th Facebook post at the request of Debtor's counsel shortly after posting the message.

---

[1] Dr. Galloway includes certain additional expenses in her proof of claim.
[2] The text of the Facebook post from April 19, 2025, reads as follows: "Hey FB peeps, need a facility in CD 6 for district convention on May 10. I'm throwing my hat in the ring for District Chair. The interim one is Sabrina Berry. You know, the one who stole $3900 from me and $5000 from a disabled veteran. He will also be in attendance at the convention to call her out WITH RECEIPTS IN HAND[.] I am tired of this rubbish. This party does not vet their candidates. Running for district chair is the last thing on my mind but someone has to stop this madness."
[3] The text of the Facebook post from April 20, 2025, reads as follows: "Sabrina Berry - calling ME disrespectful because I tracked her down and asked for repayment. Her text is in grey. She also stole from a disabled veteran. Refusing to repay him as well. Denies he gave her anything - but see, the thing is, we both have judgments against her." Dr. Galloway attached a screenshot of two text messages purportedly between the Debtor and herself.

2

Dr. Galloway, the Debtor, and a third party[4] were all candidates for the same position as the chair of a national political party's chapter in Cabarrus County, North Carolina, which several witnesses at the Hearing referred to as "congressional district six." The Debtor was serving as the interim chair of congressional district six on the Petition Date. Shortly after filing the Petition and approximately one week before the Easter holiday, in her role as interim chair, the Debtor seemingly announced online that she was a candidate for the chair position. Approximately one week later, Dr. Galloway announced her candidacy for the same position in the April 19th Facebook post, which the Debtor asserts violated the automatic stay.

On June 25, 2025, Dr. Galloway filed an objection to the Motion (the "Objection"). [D.I. 20]. In the Objection, Dr. Galloway argues that the Court should deny the Motion for several reasons, including that her "communications were made in the context of a political campaign and involved a matter of public concern, which is protected under the First Amendment" and, as such, "does not violate the automatic stay under 11 U.S.C. § 362." *Id.* ¶ 10. Dr. Galloway added that her "statements were made in the public interest, particularly because [the] Debtor is a candidate for public office" and that Dr. Galloway has a "right to inform voters about relevant, truthful facts concerning a person seeking elected office." *Id.* ¶ 9.

On July 11, 2025, Dr. Galloway filed four affidavits in support of the Objection. [D.I. 23]. Later, on July 23, 2025, Dr. Galloway emailed two additional affidavits to the Court that were immediately filed. [D.I. 26, 27]. The Debtor initially set the Hearing for July 21, 2025, but the parties agreed to continue the matter to August 5, 2025, for a special setting. At the Hearing, the parties presented arguments on the matters set forth in the Motion and Objection (collectively, the

---

[4] Going into the convention, only Dr. Galloway and the Debtor were candidates for the position. However, a third individual, Susan Smith (who is not a party in this case), was nominated on the floor of the convention and ultimately won the contest.

3

"Pleadings"). The parties submitted evidence to the Court at the Hearing, including, but not limited to, the affidavits filed by Dr. Galloway, Dr. Galloway's two Facebook posts, and an email between the Debtor's counsel and Dr. Galloway. The Court also heard testimony from 10 witnesses, including the Debtor and Dr. Galloway. The Court took the matter under advisement.

## ANALYSIS

"Under the Bankruptcy Code, filing a petition for bankruptcy automatically 'operates as a stay' of creditors' debt-collection efforts outside the umbrella of the bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020) (quoting 11 U.S.C. § 362). Among other prohibitions, the automatic stay bars "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of" the debtor's bankruptcy case. 11 U.S.C. § 362(a)(6).

### I. The Automatic Stay

The automatic stay "is one of the fundamental debtor protections provided by the bankruptcy laws, giving the debtor a breathing spell from his creditors." *Wood v. United States Dep't of Housing & Urban Development (HUD) (In re Wood)*, 993 F.3d 245, 249 (4th Cir. 2021) (citation omitted). "The stay serves to maintain the status quo and prevent dismemberment of the estate during the pendency of the bankruptcy case." *Ritzen Grp.*, 589 U.S. at 42 (citation omitted). The automatic stay is extremely broad in scope; it stops all collection efforts and all harassment of the debtor. *See Budget Serv. Co. v. Better Homes*, 804 F.2d 289, 292 (4th Cir. 1986). In cases under Chapter 7 of the Bankruptcy Code, the automatic stay provides immediate relief for debtors in financial difficulty and protects the trustee's ability to control the liquidation of property of the estate. *See id.*

Section 362(k) of the Bankruptcy Code sets out the consequences for violating the automatic stay. 11 U.S.C. § 362(k). That subsection generally provides that "an individual injured

4

by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *Id.* "A 'willful violation' does not require a specific intent to violate the automatic stay." *Cooper v. Shaw's Express, Inc. (In re Bulldog Trucking, Inc.)*, 68 F.3d 459 (4th Cir. 1995) (unpublished table opinion) (citation omitted). "Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional." *Id.* (citation omitted).

## II. **Applying Section 362(k) to This Case**

Applying the standard from section 362(k) of the Bankruptcy Code in this case, there is no dispute that Dr. Galloway learned of the Debtor's bankruptcy filing and the imposition of the automatic stay on the Petition Date, when the Debtor's counsel first emailed Dr. Galloway, informing her that the Debtor had filed the Petition. Therefore, this first prong of determining whether a willful violation of the automatic stay is satisfied. However, the evidence does not support a finding that Dr. Galloway's actions violated the automatic stay.

First, the testimony and other evidence regarding the party convention failed to substantiate the allegations in the Motion. Although the Motion asserts that Dr. Galloway walked the convention floor telling individuals that Dr. Galloway had stolen money from her, most of the credible testimony contradicted this claim and asserted that Dr. Galloway handed out a few fliers and then sat at the top of bleachers for most of the convention. Only one witness testified that he heard Dr. Galloway assert at the convention that the Debtor had "stolen" money from her (apparently referring to the money borrowed in 2023); Dr. Galloway made this statement when asking the witness to support her in the chair election that day.[5] Additionally, no evidence or

---

[5] This one witness testified that Dr. Galloway first approached him and asked for his support in her race. When the witnessed mentioned that he was not there for "political purposes" and only was there to present the keynote address,

5

testimony showed that Dr. Galloway directed anyone to speak to the Debtor or to harass her. Much of the testimony regarding the convention focused on conversations between third parties speaking about the political candidates, the nomination process, and the outcome of the election. Therefore, the Court does not find that the Debtor has met her burden to show that any conversations occurred in violation of the automatic stay at the party convention.

Second, the evidence regarding the Facebook posts does not support a finding that the creditor violated the automatic stay in these posts. Dr. Galloway asserted that she had not texted the Debtor since 2023 and obtained a judgment against the Debtor in the amount of $3,900 in September 2023. Dr. Galloway also testified that the Facebook posts were meant to share the Debtor's lack of financial responsibility, not to seek repayment of her debt. Nothing in the evidence showed that Dr. Galloway suddenly had a need for the money. In fact, the evidence from both parties demonstrated that Dr. Galloway made voluntary contributions to causes and candidates in excess of $25,000 each year, including to single mothers. Lastly, the evidence showed that the Debtor could not see these Facebook posts and only learned of their existence when a third party showed the posts to the Debtor at a later time.

None of these facts support a finding that Dr. Galloway sought to collect, assess, or recover her debt from the Debtor, particularly because Dr. Galloway did not interact or communicate at all with the Debtor following the Petition Date and did not instruct others to do so. Instead, the evidence supports a finding that Dr. Galloway decided to run for a political position for which the

---

Dr. Galloway asked who had invited him. The witness said that the chairperson, who is the Debtor, had invited him. Dr. Galloway then allegedly said, "Do you know that she stole money from me?" Again, this all occurred at a political convention, where Dr. Galloway and the Debtor were candidates for the same position and where voters gathered to vote on that race. This was the only testimony that directly supported the contention from the Motion that Dr. Galloway "walked the room advising as many people as she could that Debtor had stolen money from her and stating that she could repay the debt."

Debtor was also a candidate and decided to share this information about the Debtor because she opposed the Debtor's candidacy for this office.

It is undisputed that at least two parties—counsel for the Debtor and the Chapter 7 trustee in this case—warned Dr. Galloway that she must be careful not to violate the automatic stay when making comments about the Debtor, as certain comments could be considered an attempt to harass or pressure the Debtor into paying Dr. Galloway's claim. However, Dr. Galloway testified that she researched her rights and learned how to discuss the Debtor's financial condition during the political campaign without violating the automatic stay. Dr. Galloway even took down the April 19th Facebook post when the Debtor's counsel suggested that it was potentially in violation of the automatic stay. Looking at the evidence before the Court, Dr. Galloway "toed the line" with the Facebook posts but ultimately did not act in a way to collect, assess, or recover her claim against the Debtor. Therefore, the Court finds that the Facebook posts do not constitute an act in violation of the automatic stay.

Even assuming that these actions *did* violate the automatic stay, Dr. Galloway argues that her comments at the convention and on Facebook are protected by the Free Speech Clause contained in the First Amendment to the Constitution of the United States.[6] The Court agrees.

### III. First Amendment and the Automatic Stay

The First Amendment to the Constitution of the United States provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; *or abridging the freedom of speech*, or of the press; or the right of the people peaceably to assemble,

---

[6] Neither Dr. Galloway nor the Debtor presented any cases in the Pleadings to address the implications of the First Amendment on this dispute. Dr. Galloway referenced the First Amendment in the Objection, so the Court asked Debtor's counsel at the start of the Hearing whether he had any response to this argument or knew of any cases that had dealt with this matter. Debtor's counsel stated that he had not found any on-point cases for this issue but had found cases that universally refused to apply the Free Speech Clause of the First Amendment to void a Debtor's responsibility to comply with a court order. The Court has no occasion to weigh in on that matter in this case, as the Debtor only asserts that Dr. Galloway's actions violated a federal statute—11 U.S.C. § 362(a)(6)—not a court order.

7

and to petition the Government for a redress of grievances." U.S. Const. amend. I (emphasis added). "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (citation omitted). "As a result, the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Id.* (citation omitted). This type of speech "occupies the highest rung of the hierarchy of First Amendment values[] and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (citations omitted).

"Not all speech is of equal First Amendment importance, however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Id.* at 452 (citations omitted). As the Supreme Court has recognized, "restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest[.]" *Id.* (citation omitted). When regulating speech on private matters, "[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import." *Id.* (citation omitted).

The Supreme Court has also recognized that "[t]he arguably inappropriate or controversial character of a statement is irrelevant to" the First Amendment analysis. *See id.* at 453 (citing *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)). In the case of *Synder v. Phelps*, the Supreme Court addressed whether the First Amendment protected a church's decision to protest a soldier's funeral with "picket signs reflect[ing] the church's view that the United States is overly tolerant of sin and that God kills American soldiers as punishment." *Id.* at 447. Although the Supreme Court recognized that "funeral picketing is certainly hurtful and its contribution to public discourse may

8

be negligible," the Supreme Court held that the First Amendment shielded the church members from tort liability for their speech in that case. *Id.* at 460–61. "As a Nation, we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461.

A. **Relevant Case Law**

Several federal courts have addressed violations of the Bankruptcy Code and how the Free Speech Clause of the First Amendment may impact a party's liability for such violation. For example, in *Turner Advert. Co. v. Nat'l Serv. Corp. (In re Nat'l Serv. Corp.)*, Turner Advertising Company ("TAC") sought to post billboards disclosing that National Service Corporation ("NSC"), a plumbing business operating under the "Sears" name, had filed for bankruptcy and was unable to pay its bills.[7] 742 F.2d 859, 860 (5th Cir. 1984). NSC claimed that this action constituted harassment in violation of the automatic stay under 11 U.S.C. § 362. *Id.* The bankruptcy court agreed with NSC and enjoined TAC from posting these billboards, which the district court affirmed. *Id.* The district court concluded that TAC's proposed billboard messages were misleading commercial speech and could be constitutionally restrained. *Id.* at 861.

The United States Court of Appeals for the Fifth Circuit reversed the district court, holding that TAC's message constituted "pure speech entitled to unfettered first amendment protection[,]" rather than commercial speech. *Id.* According to the Fifth Circuit, "the message more closely resembles a public service message[,]" as it "simply states two unassailable facts[:] that NSC is in bankruptcy and that NSC cannot pay its bills." *Id.* at 862. The court emphasized that prior restraints on pure speech carry a heavy presumption against their constitutional validity and require "the

---

[7] "TAC proposed to use the advertising artwork created for NSC and superimpose over it the following messages in large black letters: 'Beware, This Company Does Not Pay Its Bills' and 'Beware, This Company Is In Bankruptcy.'" *Turner Advert. Co. v. Nat'l Serv. Corp. (In re Nat'l Serv. Corp.)*, 742 F.2d 859, 860 (5th Cir. 1984).

9

closest scrutiny." *Id.* (citing *Widmar v. Vincent*, 454 U.S. 263 (1981)). The Fifth Circuit believed that "[t]he mere fact that NSC would be damaged by TAC's dissemination of the message . . . d[id] not warrant a prior restraint." *Id.* Furthermore, the Supreme Court has recognized that the mere assertion that certain expressions are intended "to exercise a coercive impact on [a person] does not remove them from the reach of the First Amendment." *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982) (citation omitted). For these reasons, the Fifth Circuit determined that NSC had not provided a justification to impose a prior restraint on TAC's speech and reversed the order restraining TAC from posting the billboards. *See Nat'l Serv. Corp.*, 742 F.2d at 862.

Additionally, in *In re Andrus*, the court addressed whether a contempt order and injunction against a creditor, Stanley Stann, violated the First Amendment. *See* 189 B.R. 413, 415–16 (N.D. Ill. 1995). After the debtors in that case obtained a bankruptcy discharge, Stann attempted to collect the discharged debt by posting signs near the debtors' property, leaving harassing messages, and making threats to the debtors.[8] *Id.* at 414–15. The bankruptcy court found that Stann's actions were intended to force payment of the discharged debt and constituted a willful violation of the discharge injunction under 11 U.S.C. § 524. *Id.* at 415. The court ordered Stann to pay damages and remove the sign but did not prohibit him from engaging in protected speech in the future. *Id.* at 415–16.

The district court affirmed the bankruptcy court's contempt order, holding that the restrictions imposed did not violate the First Amendment. *Id.* at 414, 416. The court reasoned that Stann's conduct, though containing communicative elements, was aimed at collecting a discharged debt and, therefore, was not protected speech. *Id.* at 416. The court also found that the injunction and contempt order were content-neutral, narrowly tailored, and justified by significant

---

[8] The first sign that Stann posted read, "GENE ANDRUS, WHERE'S MY MONEY?" *Andrus*, 189 B.R. at 414. The second sign read, "GENE ANDRUS WENT BANKRUPT! HE DIDN'T PAY HIS BILLS. HE IS A DEADBEAT! THIS IS A PUBLIC SERVICE ANNOUNCEMENT." *Id.* at 415.

10

governmental interests, including "the power of the courts to enforce and protect their judicial process, and the ability of the Bankruptcy Code to protect debtors." *Id.* at 416–17. Critically, the court distinguished this case from others where speech was not accompanied by additional coercive conduct, emphasizing that not all speech is equally protected, especially when it concerns purely private matters rather than issues of public concern. *See id.* at 417 n.9, 417–18.

**B. Application**

In the instant case, it would be inappropriate for the Court to sanction Dr. Galloway for exercising her First Amendment rights in her campaign for a political office. No matter how the Debtor may choose to characterize Dr. Galloway's statements, these comments were not coercive comments directed towards the Debtor. Instead, Dr. Galloway's statements address the Debtor's liabilities, character, and alleged lack of financial responsibility, which go to the Debtor's qualifications for the office that she and Dr. Galloway both sought. Allowing Dr. Galloway and others to discuss and debate the Debtor's qualifications, while the Debtor is a candidate for a political office, is integral to the operation of our system of government.

Whether on Facebook or elsewhere, in the political context, Dr. Galloway's statements occupy the highest rung of the hierarchy of First Amendment values and are entitled to special protection, regardless of whether they may be considered inappropriate or controversial. That is because they are not matters of purely private significance. Instead, Dr. Galloway's statements, which were made only after the Debtor seemingly announced her candidacy, address a matter of significant public interest: the qualifications of a candidate for a political office. The Facebook posts are similar to a billboard in the distance sharing Dr. Galloway's views on this matter of public concern, especially because they were not sent to the Debtor and were not directly accessible to the Debtor without a third party taking proactive steps to share the posts with the Debtor. Therefore, the First Amendment likely prohibits this Court from sanctioning Dr. Galloway for this conduct.

11

However, the Court need not decide this constitutional issue today, as the Court finds that the Debtor failed to prove that Dr. Galloway violated the automatic stay.

## CONCLUSION

For the reasons set forth above, the Motion is **DENIED**.

**IT IS SO ORDERED.**

| | |
|---|---|
| **This Order has been signed electronically.** <br> **The Judge's signature and Court's seal** <br> **appear at the top of this order.** | **United States Bankruptcy Court** |